# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DARIUS MCCALL,<br><br>    Plaintiff<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE<br>DEPARTMENT, et al.,<br><br>    Defendants | Case No.: 2:18-cv-01319-APG-EJY<br><br>**Order Granting in Part and Denying in<br>Part Motions for Summary Judgment**<br><br>[ECF Nos. 48, 56, 62, 63] |

Plaintiff Darius McCall sues defendants DROCK Gaming LLC, DROCK assistant security supervisor Raymond Thompson, Las Vegas Metropolitan Police Department (LVMPD), and LVMPD police officers Jeremy Jacobitz, Brianna Muenzenmeyer, Colton Hafen, and George Ramirez-Marillo. McCall's claims arise out of an incident at The D, a hotel and casino run by DROCK, where McCall was detained by LVMPD officers and then given a trespass warning by Thompson.

McCall moves for summary judgment, arguing that officers Muenzenmeyer and Jacobitz unreasonably exceeded the length and scope of the stop by (1) detaining him even after they no longer suspected him of a crime, (2) taking his driver's license out of his wallet and giving it to Thompson without his consent, and (3) handcuffing him and keeping him in handcuffs. He therefore seeks summary judgment as to liability on his 42 U.S.C. § 1983 unreasonable seizure claim against these two defendants.

Defendants DROCK and Thompson move for summary judgment on McCall's § 1983 claim, arguing they are not state actors. DROCK also argues that as an entity, it can be liable

under § 1983 only if the alleged constitutional violation was caused by its official policy or custom, and there is no evidence of that in this case.

Defendants Jacobitz, Muenzenmeyer, Hafen, and Ramirez-Marillo move for summary judgment, arguing that (1) they had reasonable suspicion to make the initial stop, (2) Jacobitz had a reasonable basis to place McCall in handcuffs, (3) the detention was not unreasonably prolonged, and (4) Muenzenmeyer did not unconstitutionally provide McCall's identification to Thompson. They also argue that McCall's state law claims fail for similar reasons. And the officers move for qualified and discretionary immunity. Finally, Ramirez-Marillo and Hafen argue they did not personally participate in the alleged violations.

Defendant LVMPD moves for summary judgment, arguing there is no evidence of a policy or custom supporting liability against it on McCall's § 1983 claim. LVMPD also argues there is no evidence LVMPD ratified the individual officers' conduct. And LVMPD incorporates the officers' arguments that they did not engage in any constitutional or state law violations, so LVMPD cannot be liable either.

For the reasons set forth below, I grant in part and deny in part each of the parties' motions.

**I. BACKGROUND**

At the time of this incident, McCall was employed by Timeshare Liquidators, LLC, which did business under the name TLC Resorts. ECF No. 49 at 1. TLC Resorts is located on Fremont Street near The D casino. *Id.* As part of his job, McCall approached people on Fremont Street and attempted to interest them in time shares. *Id.* Because McCall worked near The D, he often used its restroom and ate at its restaurants. *Id.* He sometimes visited The D during non-work hours. *Id.*

Prior to the incident at issue, The D's director of security and surveillance, John Fiato, contacted LVMPD sergeant Michael Souder. ECF No. 52-2 at 5. Fiato sent Souder a picture of McCall and two other black males on Fremont Street. *Id.* at 5. Fiato testified he did so because he saw these three individuals come together and engage in prolonged handshakes, after which their hands would go in their pockets and they would disperse. *Id.* Fiato testified that these same individuals would then reappear and do the same thing. *Id.* Fiato knew who McCall was and that he worked on Fremont Street as a greeter for a time share company, and he knew that McCall sometimes ate at The D's restaurants. *Id.* at 4-7. Fiato testified that he believed that he told Souder that McCall was a timeshare employee. *Id.* at 4-5. Souder did not recall Fiato giving him that information. ECF No. 59-3 at 6.

On October 17, 2017, Souder told Jacobitz to go to The D and "find out what they needed." ECF No. 52-1 at 8. Souder gave Jacobitz the picture of the three black males that Fiato provided. *Id.* Either Souder or The D security told Jacobitz that The D believed that the person who was later identified as McCall was engaged in narcotics trafficking and had been frequently going in and out of The D's restroom. *Id.* at 9. There is no evidence that Souder or The D personnel told Jacobitz or Muenzenmeyer that McCall was a timeshare employee.

Jacobitz and Muenzenmeyer arrived at The D and went to the security desk. *Id.* at 8. They asked security "what we needed to do if we came in contact with" McCall who, at that point, Jacobitz knew only by sight from the picture. *Id.* The D security person told Jacobitz and Muenzenmeyer to let The D know if they came into contact with the person in the picture so The D could decide whether to issue a trespass warning to him.[1] *Id.*; ECF No. 52-4 at 18.

---

[1] McCall had not previously been read a trespass warning at The D. Thus, he was not committing a crime, nor suspected of committing a crime, simply by entering The D. *See* Nev.

Jacobitz and Muenzenmeyer then took up position at the top of an escalator on Fremont Street to watch McCall. ECF Nos. 52-1 at 9; 52-4 at 6. Jacobitz observed McCall "traveling back and forth on foot doing what appeared to be hand-to-hand transactions or at least meeting up with people." ECF No. 52-1 at 9. Muenzenmeyer testified that she saw McCall approaching another individual, shaking hands, and then McCall's hand going into his pocket. ECF No. 52-4 at 6. According to Jacobitz, the downtown area is a high crime area for narcotics transactions. ECF No. 52-1 at 9. He also knew from experience that narcotics transactions happen in casino bathrooms, and he had been told that McCall was frequently in and out of The D's restrooms. *Id.* at 10.

McCall needed to use the restroom, so he entered The D and rode an escalator up to where a restroom was located. ECF No. 49 at 2-3. Jacobitz and Muenzenmeyer were waiting for McCall at the top of the escalators. As McCall reached the top of the escalator, Jacobitz pointed at the wall and told McCall to stand facing the wall. ECF No. 49 at 2; M video at :30.[2] McCall followed this instruction. ECF No. 49 at 3; M video at :30. Jacobitz then took hold of McCall's hands behind McCall's back. ECF No. 49 at 3. Jacobitz asked if McCall had anything illegal on him and McCall responded that he did not. M video at :40. There is no evidence this response was untruthful.

/ / / /

---

Rev. Stat. § 207.200(1)(b) (providing that a person commits a trespass by willfully going onto another's property "after having been warned by the owner or occupant thereof not to trespass").

[2] The officers were wearing bodycams during this incident, so there are videos of the interaction between McCall and the defendants. Because each of the officers' last names begin with a different letter, I will cite to each video by the first letter in the officer's last name. Cited times for the videos are approximate.

Jacobitz instructed McCall to move to a different wall, which McCall did while Jacobitz continued to hold McCall's hands behind his back. *Id.* at :50. Jacobitz told McCall that the police had complaints from the casino. *Id.* at 1:00. He also told McCall that he might be trespassed from the property. *Id.* at 1:10. McCall stated that he was at work and was coming up there to use the restroom, and asked "what the hell is you talking about?" *Id.* at 1:20. McCall's tone was agitated, but he continued to stand facing the wall with his hands behind his back. *Id.*

Jacobitz asked McCall where he worked, and McCall answered that he worked for TLC. *Id.* at 1:28; ECF No. 52-1 at 12. Jacobitz told McCall to stop yelling at him, and McCall stated that he was trying to talk to Jacobitz. M video at 1:32; J video at 1:00. Jacobitz said McCall was not trying to talk to him, and McCall responded "Yes, I am, but you are treating me with disrespect." M video at 1:34. At that point, Jacobitz placed handcuffs on McCall. *Id.* at 1:36. McCall did not resist and continued to face the wall. *Id.*

Jacobitz asked McCall if he had identification and McCall said he did. *Id.* at 1:54. Jacobitz told McCall he was going to go through McCall's pockets to make sure he did not have anything illegal, and McCall responded, "ok." M video at 1:55; J video at 1:30. Jacobitz started going through McCall's pockets while he asked McCall questions, all of which McCall answered. M video at 2:10. There is no evidence that any of McCall's answers were untruthful. Jacobitz retrieved McCall's wallet, keys, and phone and gave them to Muenzenmeyer. *Id.*; J video at 1:45.

Muenzenmeyer asked McCall if his identification was in his wallet. M video at 2:30. He said it was and he consented to her removing it. *Id.* at 2:33. Jacobitz retrieved an employee badge from McCall's front shirt pocket, at which point McCall stated that he was an employee for TLC and he needed to go to the restroom. *Id.* at 2:53. Jacobitz told McCall he could turn

around to face the officers instead of the wall, and McCall did so. *Id.* at 3:09. Muenzenmeyer

then asked McCall questions about personal identifying information, which McCall provided.[3]

*Id.* at 4:00. There is no evidence his answers were untruthful.

Jacobitz then moved McCall, who was still in handcuffs, over to a seat in front of a slot

machine. *Id.* at 4:40. In the meantime, Muenzenmeyer was attempting to do a warrant check on

McCall. *Id.* at 6:50. At about the same time, Hafen and Ramirez-Marillo arrived at the top of the

escalators. *Id.* About a minute later, Hafen and Ramirez-Marillo departed to let The D security

know the police had detained McCall. *Id.* at 7:50. Jacobitz then went into the men's restroom to

make sure that one of the other individuals they had observed earlier interacting with McCall

was not in there. *Id.* at 8:15. Approximately 30 seconds later, Muenzenmeyer heard back from

dispatch that there were no warrants for McCall. *Id.* at 8:45. Muenzenmeyer informed Jacobitz

that the address McCall provided checked out and there were no warrants for McCall's arrest. *Id.*

at 9:45.

After learning this information, Jacobitz told Muenzenmeyer that he sent Hafen and

Ramirez-Marillo to retrieve The D security and that the officers would see what The D wanted to

do with McCall and then they would "get him out of here." *Id.* at 10:10; J video at 9:40. A few

seconds later, Jacobitz told McCall that the officers were "just waiting on security to see what

they want to do. This is their thing, so . . . we'll go from there. If they want to trespass you, I

don't know, maybe they do, maybe they don't, but we need to give them that chance." M video

---

[3] I caution the parties about the disclosure of personal identifiers and other privacy concerns in this case. McCall's social security number, birth date, and home address are identified in the video and in ECF No. 52-6. Additionally, Jacobitz's bodycam video is running when Jacobitz enters a public men's restroom where patrons who are not involved in this case are using the facilities. I will order Jacobitz's and Muenzenmeyer's bodycam videos as well as ECF No. 52-6 sealed for these reasons. The parties will need to consider editing these videos for trial.

at 10:35. He also told McCall "we got nothing on you." J video at 10:24. After about a minute and a half, McCall asked how long it was going to take for security to arrive. J video at 11:50. Jacobitz responded, "we'll take up to an hour if we need to. That's the right that we have." *Id.* at 11:55.

About 13 minutes into the encounter, Hafen and Ramirez-Marillo returned, along with Thompson and another individual from The D. M video at 13:00, 13:26; J video at 12:29. At that point, McCall was seated in a chair in a corner in front of a slot machine surrounded by four police officers and two The D security personnel. J video at 12:29.

Thompson asked if McCall had identification, which Muenzenmeyer handed to Thompson. M video at 13:00. Thompson then used McCall's identification to fill out a trespass card. *Id.* at 13:16. McCall asked Thompson why he was being given a trespass warning. *Id.* Jacobitz responded that Thompson would let McCall know when Thompson was ready. *Id.* at 13:20. McCall stated he had not done anything, and Jacobitz responded that it was private property and The D had a right to do what it wanted. *Id.* at 13:25. Another individual from The D took McCall's picture. *Id.* at 13:26. McCall then asked Thompson why he was being trespassed when Thompson knew him. *Id.* at 13:31. Jacobitz told McCall that if he "want[ed] to make an issue, we'll just take you to jail for it." J video at 13:05. Jacobitz told McCall he was causing a problem and McCall responded that he was not, he was just asking why he was being trespassed. *Id.* at 13:20; M video at 13:45. Jacobitz responded that Thompson would tell McCall when he was ready. M video at 13:50.

Jacobitz then told McCall that the officers would need McCall's supervisor's information "before we get you out of cuffs." J video at 13:34. Muenzenmeyer asked McCall the name of the company he worked for. M video at 14:25. McCall responded that he had given enough

information. *Id.* Jacobitz stated that if McCall was on the job, his supervisor needed to come up to get him, "otherwise we take you to jail." *Id.* at 14:33. McCall refused to provide any further information. *Id.* at 14:45. Hafen then approached McCall and tried to get the same information, but McCall refused. J video at 14:35.

Thompson returned the identification to Muenzenmeyer and gave a trespass warning to McCall, advising him that he was not welcome back to The D. M video at 15:05. McCall asked Thompson why he was being trespassed. J video at 5:14. Thompson responded "suspicious activity." *Id.*

Approximately 16 minutes into the encounter, and about 3 minutes after Thompson arrived, Hafen began to remove the handcuffs. M video at 16:00. Hafen then asked Thompson if McCall could use the restroom, and Thompson agreed. *Id.* at 16:30. Muenzenmeyer returned McCall's wallet, phone, and keys, and McCall went to use the restroom. *Id.* at 16:55. Hafen and Jacobitz followed him into the restroom. J video at 16:50. Afterward, the officers and The D personnel escorted McCall out of the building. M video at 18:00. The entire incident inside The D lasted approximately 18 minutes. *See generally* M video.

All four officers followed McCall onto Fremont Street to a nearby store where an individual was sitting at a podium. J video at 18:40; M video at 19:30. Jacobitz asked the person at the podium whether McCall was working for him. J video at 18:50. That person said McCall works inside that location. *Id.* McCall indicated he wanted Jacobitz's badge number and his name. *Id.* at 19:33. Jacobitz provided his badge number. *Id.* at 19:50. When a female standing next to McCall said something, Jacobitz told her "you have nothing to do with this so back away." *Id.* at 19:56. Jacobitz then stated McCall was "obviously up to no good." *Id.* at 20:05.

McCall walked into the store and Jacobitz and the other officers walked away. *Id.*; R-M video 7_13 at 8:34.

Based on this interaction, McCall asserts state law claims for false imprisonment, battery, defamation, negligence, intentional infliction of emotional distress, intentional interference with contractual rights, and trespass to chattels. He alleges LVMPD and The D are liable based on respondeat superior for these claims. He also asserts a claim under § 1983 for unreasonable seizure, and he alleges that LVMPD is liable because the officers' actions were taken pursuant to LVMPD policies and practices, and because LVMPD ratified the officers' actions.

## II. LEGAL STANDARD

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (quotation omitted). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary

judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008). When the parties simultaneous move for summary judgment on the same claim, I "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quotation omitted).

## III. SECTION 1983

To establish liability under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). McCall asserts the defendants violated his constitutional rights by: (1) initially detaining him without reasonable suspicion, (2) continuing to detain him after any reasonable suspicion was dispelled, (3) handcuffing him and keeping him in handcuffs throughout the encounter, and (4) handing his identification to Thompson.

DROCK and Thompson argue they did not act under color of law, so they cannot be liable under § 1983. They also argue they did not participate in any of the alleged violations because the officers were the ones who detained McCall, handcuffed him, and handed his identification to Thompson. And DROCK argues that none of these acts was the result of a policy, custom, or practice of The D.

The police officers do not dispute that they acted under color of law. So the only questions are whether the officers violated McCall's rights and whether they are entitled to

qualified immunity.  LVMPD argues that any constitutional violation was not the result of an

official policy, custom, or practice.

**A.  Defendants Thompson and DROCK**

A defendant acts under color of law if he "exercise [s] power possessed by virtue of state

law and made possible only because the wrongdoer is clothed with the authority of state law."

*West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation omitted).  "Action under color of state law

normally consists of action taken by a public agency or officer." *Taylor v. First Wyo. Bank, N.A.*,

707 F.2d 388, 389 (9th Cir. 1983).

Under some circumstances, private individuals and entities may be liable as

governmental actors. *See Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003); *Morse v. N.

Coast Opportunities, Inc.*, 118 F.3d 1338, 1340 (9th Cir. 1997).  Conduct by a private individual

constitutes state action where (1) the claimed deprivation "'resulted from the exercise of a right

or privilege having its source in state authority,'" and (2) under the facts of the particular case,

the private party appropriately may be characterized as a state actor. *Villegas v. Gilroy Garlic

Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008) (quoting *Lugar v. Edmondson Oil Co., Inc.*,

457 U.S. 922, 939 (1982)).  When the § 1983 claim is against a private entity, the plaintiff also

must show that the alleged constitutional violation "was caused by an official policy or custom

of" the entity. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

The courts have identified several tests to determine whether a private entity acts under

the color of state law, including when the private person or entity acts jointly with the State

("joint action test"). *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir. 1997).  Although the

various tests are helpful in determining state involvement, "'there is no specific formula for

defining state action.'" S*utton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836 (9th Cir.

1999) (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotation omitted)).

Rather, I look to whether a sufficiently close nexus between the state and the challenged conduct

exists to fairly attribute the conduct to the state. *Id.* The inquiry is fact specific. *Id.* I begin with

the presumption that private conduct does not constitute governmental action. *Id.* at 835.

McCall relies on the joint action test. "To be engaged in joint action, a private party must

be a willful participant with the State or its agents in an activity which deprives others of

constitutional rights." *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1211 (9th Cir.

2002) (quotation omitted). There must be a "substantial degree of cooperation" between the

private actor and the state to support finding a private actor jointly acted with the state. *Franklin*

*v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). If the plaintiff can show the police substantially

cooperated with the private actor on multiple occasions, that may suffice to support state action.

*Howerton*, 708 F.2d at 381. However, merely complaining to the police or the police standing

by to keep the peace do not amount to joint action. *Peng v. Mei Chin Penghu*, 335 F.3d 970, 980

(9th Cir. 2003) (A "single request to the police, without more, [is] not sufficient to establish a

claim against a private actor pursuant to § 1983."); *Collins v. Womancare*, 878 F.2d 1145, 1155-

56 (9th Cir. 1989).

McCall does not point to evidence showing that Thompson was engaged in joint action

with the police officers. Thompson's involvement was limited to being told the officers had

detained McCall and to reading McCall a trespass warning at the direction of his supervisor,

Fiato. There is no evidence Thompson was jointly involved with the decision to detain McCall,

place him in handcuffs, or hold him until Thompson arrived. Finally, the fact that

Muenzenmeyer handed McCall's identification to Thompson does not suffice to show Thompson

/ / / /

acted under color of law by taking the identification offered to him by a police officer.  I therefore grant Thompson summary judgment on McCall's § 1983 claim.

As for DROCK, McCall argues that Fiato testified it was DROCK's policy to detain subjects to issue them trespass warnings and that DROCK requested the police to read trespass warnings.  He also argues Hafen testified that McCall was being held so that DROCK could comply with its own policies on trespassers.  DROCK argues that the LVMPD police officers conducted their own investigation, made their own decisions about detention and handcuffing, and there is no evidence any DROCK employee participated in the alleged violations.

Fiato testified that The D detains individuals to either read them a trespass warning itself or to get the police to read a trespass warning. ECF No. 59-2 at 12.  That is not what happened, here, however, because The D did not detain McCall, the police did.  So even if this was DROCK's policy, it could not have caused any alleged constitutional violations as to McCall.

Hafen testified it was The D's policy to take photographs of individuals it wanted to read a trespass warning so it could identify the person later should he or she come back, and he testified the police were detaining McCall while The D accomplished these tasks. ECF No. 59-8 at 11.  A reasonable inference from his testimony is that the officers were holding McCall so The D security personnel could complete tasks associated with The D's policies on issuing trespass warnings, including taking McCall's photograph and obtaining his information.

But the officers' decision to detain McCall while The D completed those tasks does not transform The D's private conduct into action under color of law.  There is no evidence the police have held individuals in custody solely for the purpose of allowing The D to complete a private trespass warning other than this single instance (assuming that is what happened here). Nor is there evidence the officers substituted their own judgment for The D's because no

personnel from The D was present when the officers detained McCall or placed him in handcuffs.  There is no evidence there was a prearranged plan for the officers to detain McCall or handcuff him.  Rather, the testimony shows The D requested to be notified if the officers stopped McCall.  Whether and for how long to detain McCall and whether and when to use handcuffs were decisions made solely by the officers.  The officers' conduct cannot be attributed to Thompson or DROCK and does not transform these private actors into state actors.  I therefore grant Thompson and DROCK's motion for summary judgment on McCall's § 1983 claim.

**B.  The Police Officer Defendants and LVMPD**

The police officers and LVMPD admit they acted under color of law.  As a result, the only questions as to them are whether the officers violated McCall's rights, whether the officers are entitled to qualified immunity, and whether LVMPD can be held liable for any violations.

*1.  Qualified Immunity*

To allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," government officials performing discretionary functions may be entitled to qualified immunity for claims made under § 1983. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  I apply "a two-prong analysis to determine whether officials are entitled to qualified immunity: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) if so, whether that right was clearly established at the time of the event." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1075 (9th Cir. 2011).  I may address these questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first question, I view the facts in the light most favorable to the plaintiff to determine whether the evidence shows the defendant's conduct violated a constitutional right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). If the plaintiff has shown the defendant violated a constitutional right, I then must determine whether that right was clearly established. *Id.*

A right is clearly established if "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). I make this second inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 200. An officer will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Wilkins*, 350 F.3d at 955. The plaintiff bears the burden of showing that the right at issue was clearly established. *Sorrels*, 290 F.3d at 969. But a plaintiff need not establish a court previously declared the defendant's behavior unconstitutional if it would be clear from prior precedent that the conduct was unlawful. *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997). Additionally, a plaintiff may meet his burden on the clearly established prong by showing the defendant's conduct was "such a far cry from what any reasonable . . . official could have believed was legal that the defendants knew or should have known they were breaking the law." *Sorrels*, 290 F.3d at 971.

### 2. LVMPD Entity Liability

McCall may establish LVMPD's liability in one of three ways. First, he may prove that an LVMPD officer "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom" that constitutes LVMPD's "standard

operating procedure." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (quotation omitted).  McCall also must show that the policy, custom, or practice was "the moving force behind the constitutional violation he suffered." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (quotation omitted).  Second, McCall may show that "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy." *Gillette*, 979 F.2d at 1346 (quotation omitted).  Finally, he may "prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1346-47.

### 3. The Initial Detention[4]

Police officers may make "limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698 (1981).  An officer briefly may detain a suspect to maintain the status quo while investigating criminal activity. *Id.*  Such detentions, which are sometimes referred to as *Terry*[5] stops, may be made on less than probable cause so long as the officers have "a reasonable, articulable suspicion that justifies their actions." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (quotation omitted).  The reasonable suspicion standard "merely requires a minimal level of objective justification." *Id.* (quotation omitted).

To determine whether a seizure is permissible on less than probable cause, "it is necessary to examine both the character of the official intrusion and its justification." *Michigan*, 452 U.S. at 701.  The Fourth Amendment's objective reasonableness test governs whether the

---

[4] McCall does not move for summary judgment on whether the initial stop was reasonable.

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

seizure was unreasonable. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under this test, I

balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake." *United States v. Enslin*, 327 F.3d

788, 796 (9th Cir. 2003) (quotation omitted).  Among the factors to consider are the severity of

the crime at issue, whether the suspect posed an immediate threat to safety, and whether the

suspect actively resisted arrest or fled. *Graham*, 490 U.S. at 396.  The inquiry is fact specific,

based on a totality of the circumstances. *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir.

2008).

An investigative detention "must be temporary and last no longer than is necessary to

effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  Additionally,

"the investigative methods employed should be the least intrusive means reasonably available to

verify or dispel the officer's suspicion in a short period of time." *Id.*  Consequently, to determine

whether a seizure is unreasonable, I consider both "whether the officer's action was justified at

its inception, and whether it was reasonably related in scope to the circumstances which justified

the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).  The defendants bear

the burden of showing that "the seizure [they] seek[] to justify on the basis of a reasonable

suspicion was sufficiently limited in scope and duration to satisfy the conditions of an

investigative seizure." *Royer*, 460 U.S. at 500.

Even viewing the facts in the light most favorable to McCall, no genuine dispute remains

that the defendants had reasonable suspicion to conduct the initial investigative detention of

McCall.  The police officers received a tip from casino security that three men were behaving

suspiciously on Fremont Street, a known narcotics trafficking area.  The officers were told that

the three men were meeting up, shaking hands, dispersing, and then repeating that activity.  They

reasonably could conclude this was consistent with hand-to-hand narcotics trafficking. They were told that McCall frequently used The D's restroom, and they knew that casino bathrooms are often used for narcotics transactions.

The officers observed McCall engaging in hand-to-hand interactions as described and then heading for The D's restroom. The fact that McCall's behavior was consistent with his job does not mean he could not also have been engaged in drug transactions. Reasonable suspicion does not depend on the officers being right about their suspicions. Because no genuine dispute remains that the officers had an articulable basis for suspecting McCall was engaged in criminal activity, I grant the defendants' motions for summary judgment on this part of McCall's § 1983 claim.

### 4. *Length and Scope of the Detention*

#### a.  McCall's Motion

Viewing the facts in the light most favorable to the defendants on McCall's motion for summary judgment, a reasonable jury could find the defendants did not unreasonably prolong the detention. Initially, the officers were waiting for a warrant check. McCall argues that once that came back, the officers had dispelled any reasonable suspicion and should have let him go at that point, but instead continued to detain him so that The D could read him a trespass warning. However, Jacobitz testified that he was also waiting to hear back from other officers about whether they had detained the person with whom McCall was seen interacting. ECF No. 52-1 at 19. If a jury credited this testimony, then it could find the detention was reasonably related to continuing to investigate whether McCall had engaged in criminal activity with the other individual. I therefore deny McCall's motion for summary judgment as to this portion of his § 1983 claim.

### b. Jacobitz and Muenzenmeyer

Viewing the evidence in the light most favorable to McCall on the defendants' motions for summary judgment, a reasonable jury could find the detention was unreasonably long because even though the officers had not found any weapons or narcotics on McCall and had no other basis to continue to suspect him of criminal activity, the officers continued to detain him for The D's purposes. After the warrant check came back, Jacobitz informed not only McCall, but also his partner Muenzenmeyer, that they would wait and see if The D wanted to issue a trespass warning to McCall and then they would let him go. Muenzenmeyer testified that at the point the warrant check came back, the investigation was over and that they were holding McCall so The D could read him a trespass warning. ECF No. 52-4 at 18.

A reasonable jury thus could find that Jacobitz and Muenzenmeyer continued to detain McCall longer than necessary to investigate suspected criminal activity and instead held him for The D's private purpose. Indeed, as soon as the trespass warning was given, the officers released McCall from handcuffs and appeared to conduct no further investigation. Further, the officers are not entitled to qualified immunity because it would be clear to a reasonable officer that detaining McCall without a valid investigatory purpose would violate the Fourth Amendment. *Royer*, 460 U.S. at 500. I therefore deny summary judgment to Jacobitz and Muenzenmeyer for this portion of McCall's § 1983 claim.

### c. Hafen and Ramirez-Marillo

Police officers are not liable for an alleged constitutional violation "merely for being present at the scene of an alleged unlawful act." *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002). But an officer may be liable even if his or her own conduct does not independently constitute a constitutional violation if he or she was an integral participant in the challenged

action. *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004) (holding that officers who provided armed backup for another officer who unconstitutionally deployed a flash-bang device could be held liable for excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed"). An officer thus may "be held liable where he is just one participant in a sequence of events that gives rise to a constitutional violation." *Nicholson v. City of L.A.*, 935 F.3d 685, 691-92 (9th Cir. 2019). Evidence that an officer was an integral participant includes being on the scene and taking actions that furthered in some meaningful way the search or seizure being challenged and being aware of the decision being made and not objecting to it. *Boyd*, 374 F.3d at 780.

When Hafen and Ramirez-Marillo left to get The D security, the warrant check had not been completed. At that point, there is no genuine dispute that McCall was not being detained solely for the purpose of allowing The D to read him a trespass warning. They thus were not integral participants in any unconstitutional detention between the time they left to retrieve security and when they returned. *Cf. Sjurset v. Button*, 810 F.3d 609, 619 (9th Cir. 2015) (holding that police officers were not integral participants where they were not "privy to any discussions, briefings, or collective decisions made by [a state agency] in its protective-custody determination"). Consequently, Hafen and Ramirez-Marillo were not integral participants in the decision to detain McCall after the time McCall contends all reasonable suspicion was dispelled.

However, a reasonable jury could find they were integral participants in McCall's continued detention once they returned with Thompson. The four officers surrounded McCall while Thompson read the trespass warning. Additionally, once that was completed, Hafen asked

McCall if he was willing to leave the property, and when McCall said he would, Hafen removed the handcuffs. Hafen also stated in his deposition that even though the investigation was "over" and the police were trying to get McCall "out of there," they "still have to do this first," referring to allowing The D to give the trespass warning. ECF No. 59-8. Accordingly, a reasonable jury could find that Hafen and Ramirez-Marillo violated McCall's constitutional rights when they continued to detain him longer than necessary to investigate suspected criminal activity. And as noted above, Hafen and Ramirez-Marillo would not be entitled to qualified immunity. I therefore grant in part and deny in part the defendants' motion as to this portion of McCall's § 1983 claim as to defendants Hafen and Ramirez-Marillo.

### 4. LVMPD

LVMPD argues that even if the detention was unreasonably long, there is no evidence this violation occurred as a result of a policy, custom, or practice of LVMPD. McCall responds that LVMPD had a policy or custom of holding subjects for the sole purpose of allowing a casino to read a trespass warning to the person. He relies on the following evidence to support this assertion: (a) an internal affairs letter; (b) a citizens review board letter, (c) Muenzenmeyer's testimony that she complied with LVMPD policies and practices, (d) testimony by two officers in a different case, (e) Souder's testimony, and (f) the actions of the four officers in this case. As discussed below, this evidence does not raise a genuine dispute about a policy, custom, or practice.

### i. Internal Affairs Letter

McCall argues that the internal affairs letter shows that Sheriff Lombardo ratified the officers' conduct in this case. LVMPD replies that the internal affairs letter was addressing McCall's claim of racial profiling, not an alleged detention policy.

For the ratification theory of entity liability, there must be "evidence of a conscious, affirmative choice" by the ratifying, policymaking official. *Gillette*, 979 F.2d at 1347. That official must "make a deliberate choice from among various alternatives to follow a particular course of action," and he or she must "approve a subordinate's decision and the basis for it before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Id.* at 1348 (emphasis omitted).

McCall filed a complaint with LVMPD stating his belief that Jacobitz had no basis to stop or detain him and that he was being racially profiled. ECF No. 63-5 at 8. McCall mentions in his complaint letter that he was handcuffed, and that when Jacobitz "realized his mistake, he then sent several members of his team to speak with" The D's security. *Id.* The internal affairs letter states that the investigation into McCall's complaint "failed to produce sufficient evidence to clearly prove or disprove the allegation(s), or it was determined the actions taken by the employee(s) did not rise to the level of misconduct, or was not a policy violation(s)." ECF No. 63-5 at 2.

McCall's complaint letter does not indicate he was complaining about being detained solely so that The D could trespass him. Rather, he complained that Jacobitz had no basis to detain him initially and that he was being racially profiled. The internal affairs letter states three possible findings: there was insufficient evidence, the employees' actions did not rise to the level of misconduct, or there was no policy violation. That does not constitute ratification of every action the officers took and the basis for these actions. Nor does it constitute acknowledgement and ratification of an alleged policy or practice of detaining individuals solely for the purpose of allowing the casino to read a trespass warning. The internal affairs letter therefore does not raise a genuine dispute that LVMPD ratified the officers' conduct.

22

### ii. Citizens Review Board Letter

The citizens review board is not a policymaking authority for LVMPD. As stated in the board's letter to McCall, it is a panel "composed of five volunteers from the community." ECF No. 63-5 at 4. Consequently, the board cannot ratify the officers' conduct nor can its determination in this case constitute evidence of a longstanding custom or practice of LVMPD.

### iii. Muenzenmeyer's testimony

McCall relies on Muenzenmeyer's deposition testimony that she followed LVMPD policies and practices during the incident. LVMPD argues that Muenzenmeyer testified only that she complied with LVMPD policies and practices, not that LVMPD had a policy or practice of detaining people so that a casino can trespass them.

At her deposition, Muenzenmeyer was asked whether she followed LVMPD's policies and procedures at all times during the incident with McCall, and she responded that she did. ECF No. 67-3. That does not raise a genuine dispute that LVMPD had a policy or practice of detaining people solely for the purpose of allowing a casino to read a trespass warning. If McCall wanted to ask Muenzenmeyer if LVMPD had that policy or practice, he should have asked her. Her answer to the generic question of whether she followed LVMPD policies and practices does not establish that LVMPD had a policy or practice of detaining individuals for the sole purpose of allowing a casino to trespass those persons, which she then followed.

////

### iv. Testimony from Another Case

McCall submits the testimony from police officers Mitchell Neddo and Cody Bunn from another case. ECF No. 67-4 at 1-10. LVMPD objects because this evidence was not produced in discovery in this case.

Neddo and Bunn's depositions were not disclosed in discovery. Discovery closed on June 11, 2019. ECF No. 42. Bunn and Neddo were deposed on July 23 and 25, 2019. ECF No. 67-4 at 2, 8. According to LVMPD, these depositions were disclosed to it only three days before McCall filed his opposition to LVMPD's summary judgment motion, which would have been in late September 2019. ECF Nos. 67, 69 at 8.

Under Federal Rule of Civil Procedure 37(c)(1), if a party fails to provide information as required by Rule 26(e), the party is not allowed to use that information to supply evidence on a motion, or hearing, or at trial, unless the failure was substantially justified or is harmless. The disclosing party bears the burden of showing that the failure to disclose was substantially justified or harmless. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Even if a party cannot show harmlessness or substantial justification, I am not required to exclude evidence as a sanction. *Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586, 594 (D. Nev. 2011). When excluding evidence would "amount[ ] to dismissal of a claim, the district court [is] required to consider whether the noncompliance involved willfulness, fault, or bad faith." *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012). I have wide discretion in determining the appropriate sanction. *See Yeti*, 259 F.3d at 1106. In making that determination, I consider: (1) "the public's interest in expeditious resolution of litigation;" (2) "the court's need to manage its docket;" (3) the risk of prejudice to the party seeking sanctions; (4) "the public policy favoring disposition of cases on their merits;" and (5) "the availability of less drastic sanctions." *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

McCall has not shown that his failure to supplement in a timely manner was substantially justified or harmless. Given that he disclosed the depositions only three days before he filed his

opposition, even though the depositions had been conducted approximately two months prior, he should have anticipated that LVMPD would object to their inclusion as evidence in this case. I decline to consider this evidence at summary judgment because McCall is at fault for the failure to timely disclose and LVMPD has been deprived of the opportunity to conduct discovery related to this new evidence developed in an entirely separate case. Reopening discovery at this late stage, when all parties have fully briefed summary judgment motions, would prejudice LVMPD and would prolong this case. McCall had a full discovery period in which to develop similar evidence, but he apparently failed to do so. I therefore decline to consider this late-disclosed evidence in this case.

v. Souder's Testimony

McCall contends Souder testified that it would not be abnormal for LVMPD officers to detain someone so a casino could read a trespass warning. LVMPD responds that Souder did not testify that LVMPD had a policy of detaining someone solely for that purpose.

Souder testified as follows:

> Q: Is it within the policies, practices, and procedures of [LVMPD], through your experience and your direction, to hold a suspect or a—let's go with subject—to hold a subject in order that a casino provide a trespass warning that they have stated they want to give?
> A: If it was requested for assistance based on the type of activity they felt he was involved in and it was safer for officers to deal with the subject, instead of poorly trained security guards in most instances, that would not be abnormal.

ECF No. 67-2 at 24. After clarifying that the question was directed only at allowing the casino to read a trespass warning to the subject, not arrest the person for trespassing, the questioning continued:

> Q: So having recognized that distinction, if a casino has requested that somebody be trespassed and that person is in police custody, is it expected and part of the polices, practices, and procedures of the LVMPD that the officers who

25

have the person in custody will continue to hold him in custody in order that the casino be able to provide the trespass warning?

. . .

A: It's not specifically stated that it won't be, and an officer has 60 minutes to detain him there for the basis of their investigation. It would be no different than if they were chasing him off the street and he ran inside the hotel. And the hotel, while we're dealing with the subject, if he was detained inside, hey, by the way, we don't want that guy in here, if he's running from police and running into our property, we're going to call a trespass and there would be no distinction.

*Id.* at 24. Souder then testified that "[o]bviously," any continued detention "has to be in the ongoing course of your investigation, whatever that may be." *Id.* at 25. The following exchange then took place:

Q: Okay. And you're saying it could be part of the ongoing course to facilitate a trespass by a casino?

A: I'm saying that it's not abnormal, and I'm saying it doesn't state anywhere that you could not do that.

*Id.* at 25.

Souder's testimony does not raise an issue of fact that LVMPD has a policy and practice of detaining individuals for the sole purpose of allowing a casino to read a trespass warning. Read in context, Souder testified that if LVMPD officers were detaining the individual for other reasons, they would allow the casino to read a trespass warning in the course of the detention.

vi. The Officers' Conduct in This Case

McCall argues that the fact that the four officers in this case behaved similarly suggests a custom or practice of detaining individuals for a casino to read a trespass warning. LVMPD responds that this one incident cannot show a longstanding custom or practice.

"Absent a formal governmental policy, [McCall] must show a longstanding practice or custom which constitutes the standard operating procedure of" LVMPD. *Trevino v. Gates*, 99

F.3d 911, 918 (9th Cir. 1996) (quotation omitted). "The custom must be so persistent and widespread that it constitutes a permanent and well settled [LVMPD] policy." *Id.* (quotation omitted). McCall thus must present evidence of "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Consequently, a "single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003) (quotation omitted).

Evidence that the four officers here acted similarly with respect to McCall's detention is a single incident. It thus does not show a longstanding custom or practice.

### vii. Summary

McCall has not presented evidence raising a genuine dispute that LVMPD has a policy, custom, or practice of detaining individuals for the sole purpose of allowing a casino to read a trespass warning. I therefore grant LVMPD's motion with respect to this portion of McCall's § 1983 claim.

### 3. Handcuffing

"Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). However, police officers may employ more "intrusive and aggressive" conduct without turning a stop into an arrest "when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Miles*, 247 F.3d 1009, 1012-13 (9th Cir. 2001) (quotation omitted).

"In determining whether the use of intrusive techniques turns a stop into an arrest, [I] examine the reasonableness of the police conduct in light of a number of factors." *Washington*, 98 F.3d at 1189. Those factors include: (1) whether the subject "is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;" (2) whether "the police have information that the suspect is currently armed;" (3) whether the stop either closely follows a violent crime or the police have information that a violent crime is about to occur; (4) the number of police officers present, (5) whether the police have specific information that leads them to suspect that the subject is the actual suspect being sought, and (6) whether the police have specific information that "the persons actually being sought are likely to forcibly resist police interrogation." *Id.* at 1189-90. As to these last two factors, the "more specific the information in both these regards, the more reasonable the decision to take extraordinary measures to ensure the officers' safety." *Id.* at 1190.

### a. Jacobitz and Muenzenmeyer's Motion

Viewing the evidence in the light most favorable to McCall on the defendants' motions, a reasonable jury could find the use of handcuffs was unreasonable, both at the time Jacobitz first handcuffed McCall and throughout the encounter. A reasonable jury could find that McCall was cooperative, followed every command, answered every question, and did not resist Jacobitz holding his hands behind his back. The officers had no specific information to suspect McCall was armed or was likely to resist interrogation, or that a violent crime had occurred or was about to occur. The officers were armed and outnumbered McCall two to one initially, and later four to one. McCall remained in handcuffs after Jacobitz went through his pockets and found no weapons or drugs, and after the warrant check came back.

The officers are not entitled to qualified immunity because the law was clearly established that if a subject of an investigative stop is "cooperative and the officers do not have specific information that [he is] armed or specific information linking [him] to a recent or inchoate dangerous crime, the use of such aggressive and highly intrusive tactics is not warranted, at least when, as here, there are no other extraordinary circumstances involved." *Washington*, 98 F.3d at 1192; *see also Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003) (holding an officer violated the Fourth Amendment where the officer handcuffed an individual during a search where he had no reason to suspect the occupants of the home to be searched were dangerous, the crime at issue was a non-violent tax crime, and the handcuffed individual did not impede the search, threaten the officer, or attempt to flee). I therefore deny summary judgment to Jacobitz and Muenzenmeyer on this portion of McCall's § 1983 claim.

### b. Hafen and Ramirez-Marillo Motion

As with the detention question, Hafen and Ramirez-Marillo are entitled to summary judgment as to the initial decision to place McCall in handcuffs. They were not on the scene at that time and played no part in the decision to handcuff McCall. And there is no evidence of a prearranged agreement among the officers to handcuff McCall.

However, viewing the evidence in the light most favorable to McCall, a reasonable jury could find Hafen and Ramirez-Marillo were integral participants in McCall's detention in handcuffs when they returned with The D security. They surrounded McCall while Thompson read him the trespass warning and did not object to his continued detention in handcuffs even though he was unarmed, not resisting or attempting to flee, and surrounded by four armed police officers. I therefore grant in part and deny in part the defendants' motion on this portion of McCall's § 1983 claim as to Hafen and Ramirez-Marillo.

### c.  LVMPD's Motion

LVMPD argues that McCall cannot show any violations were the result of an LVMPD policy, custom, or practice.  McCall responds that Muenzenmeyer testified it was common practice to handcuff subjects during *Terry* stops.  In its reply, LVMPD does not specifically address this testimony, or a practice of handcuffing during *Terry* stops.

Muenzenmeyer testified that it was "standard practice for an individual being stopped for an investigative detention to be placed in handcuffs." ECF No. 67-3 at 11.  A reasonable jury crediting this testimony could find that LVMPD had an unofficial custom or practice of placing *Terry* stop subjects in handcuffs.  I therefore deny LVMPD's motion as to this portion of McCall's § 1983 claim.

### d.  McCall's Motion

Viewing the facts in the light most favorable to the defendants, a reasonable jury could find Jacobitz's initial decision to place McCall in handcuffs was reasonable.  When Jacobitz first placed McCall in handcuffs, Jacobitz had not completed a weapons frisk, and although McCall was complying with instructions, his tone of voice could be perceived as agitated.  The Ninth Circuit has "held it is reasonable for an officer to assume a suspected narcotics trafficker is likely armed." *Thomas v. Dillard*, 818 F.3d 864, 878 (9th Cir. 2016), as amended (May 5, 2016).  Consequently, a reasonable jury could conclude that temporarily placing McCall in handcuffs was reasonable for officer safety.  I therefore deny McCall's motion as to the initial decision to handcuff him.

However, by the time Hafen and Ramirez-Marillo returned with Thompson, the officers had determined that McCall was unarmed and had no warrants.  He had complied with every command, had not resisted, and did not attempt to flee.  Upon Hafen and Ramirez-Marillo's

return, he was seated in a chair in a corner surrounded by four armed police officers. His continued detention in handcuffs at that point was unreasonable as a matter of law. The officers are not entitled to qualified immunity because a reasonable officer would know that continuing to detain McCall in handcuffs was unreasonable where the officers knew he was unarmed, he had complied with their commands, he had not resisted or attempted to flee, he was outnumbered four to one, and the officers had no intention to arrest him for any crime, much less a violent crime. *See Meredith*, 342 F.3d at 1063; *Washington*, 98 F.3d at 1192. I therefore grant summary judgment in McCall's favor on this portion of his § 1983 claim against Jacobitz and Muenzenmeyer.

Viewing the facts in the light most favorable to Hafen and Ramirez-Marillo on McCall's motion, it will be up to a jury to decide whether Hafen and Ramirez-Marillo were integral participants in this violation. Because Hafen and Ramirez-Marillo were not there for the initial decision to handcuff McCall and did not witness most of McCall's interactions with Jacobitz and Muenzenmeyer, a reasonable jury could find they lacked sufficient information to question McCall's continued detention in handcuffs and thus were not integral participants in the decision to keep McCall handcuffed. Likewise, the jury will have to decide whether the continued detention in handcuffs was the result of LVMPD's alleged "standard practice" of handcuffing subjects during *Terry* stops. I therefore deny McCall's motion as to these defendants.

### 4. Identification

McCall moves for summary judgment against Muenzenmeyer, contending she violated his Fourth Amendment property rights by turning over his identification to Thompson without his consent. Muenzenmeyer argues McCall "effectively consented" to her handing his

identification over to The D when he did not object. ECF No. 52 at 21-22. Alternatively, she argues she is entitled to qualified immunity.

As an initial matter, no genuine dispute remains that McCall voluntarily allowed Muenzenmeyer to obtain his identification. McCall argues that he was compelled to provide his identification, but the case he cites does not support that contention. Under *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, Nevada's "stop and identify" statute "does not require a suspect to give the officer a driver's license or any other document. Provided that the suspect either states his name or communicates it to the officer by other means—a choice, we assume, that the suspect may make—the statute is satisfied and no violation occurs." 542 U.S. 177, 185 (2004). The bodycam videos show McCall voluntarily consented to Muenzenmeyer obtaining his identification from his wallet.

Muenzenmeyer asserts she is entitled to qualified immunity on this claim. To determine whether a particular right was clearly established at the time of the alleged violation, I begin "by looking to binding precedent." *Boyd*, 374 F.3d at 781. "If the right is clearly established by decisional authority of the Supreme Court or this Circuit, [the] inquiry should come to an end." *Id.* In "the absence of binding precedent, [I] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation omitted). Absent controlling authority, there must be "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (quotation omitted).

The only Ninth Circuit authority McCall identifies is not sufficiently analogous to constitute clearly established law. *See Vanderhook v. Coleman*, No. 91-16272, 988 F.2d 126, 1993 WL 43857 (9th Cir. 1993) (holding that a prisoner's claim that a prison official "seized his

ring and gave it to another inmate without giving [him] an opportunity to contest the other inmate's claim to the ring" stated an arguable due process violation).[6]  I may not "define clearly established law at a high level of generality." *Ashcroft*, 563 U.S. at 742.  Rather, I must determine "whether the constitutional right was clearly established in light of the specific context of the case at the time of the events in question." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quotation omitted).

McCall does not identify any Supreme Court or Ninth Circuit authority that would provide guidance as to whether a police officer violates the Fourth Amendment by temporarily handing a driver's license to a property owner so the property owner could write out a trespass warning.  Thus, I "must ask whether, despite the absence of binding precedent, there was sufficient non-binding authority to place the officers on notice that" they would violate the Fourth Amendment by handing McCall's identification, which he voluntarily gave to the officer, to casino security for the casino to copy the information. *Boyd*, 374 F.3d at 781.

McCall relies on an unpublished decision out of the Northern District of Mississippi, *Grosch v. Tunica County, Mississippi (Grosch I)*, No. 2:06CV204-P-A, 2008 WL 114773 (N.D. Miss. Jan. 8, 2008).  In that case, the plaintiff was gambling at a casino in Mississippi when a casino official approached him and told him he was no longer welcome there. 2008 WL 114773,

---

[6] The other cases McCall cites similarly do not involve analogous fact patterns. *See Wolfenbarger v. Williams*, 774 F.2d 358, (10th Cir. 1985) (holding the plaintiff stated a due process claim where the police seized from her pawn shop items that were reported stolen and gave them to the person claiming ownership without a judicial determination of who owned the property); *Bazley v. Woodruff*, No. 2:12-cv-2496 KJM CKD P, 2014 U.S. Dist. LEXIS 33648 (E.D. Cal. Mar. 13, 2014) (holding the plaintiff failed to allege a due process claim because he did not attempt to seek redress for highway patrol officer's decision to turn his car over to his estranged wife and stating that the case "essentially concern[ed] a family dispute over who had a right to possess the car while plaintiff was in jail").

at *1.  The casino official asked for the plaintiff's identification, which he refused to provide. *Id.*
The casino official then called the sheriff's office. *Id.*

The sheriff's deputies arrived and requested the plaintiff's identification. *Id.* at *2.
Unlike Nevada, Mississippi did not have a stop and identify statute. *Id.* at *6.  The plaintiff
nevertheless agreed to give his identification to the deputies on the condition that they not
provide it to the casino. *Id.* at *1.  The deputies rejected that condition. *Id.*  According to one of
the deputies, the plaintiff then became unruly, so he arrested the plaintiff for disorderly conduct.
*Id.*  The plaintiff contended he was calm and was told he was being arrested for not producing
his identification, even though no Mississippi law required that he provide it. *Id.*  Instead of
taking the plaintiff to jail, the deputies took him to the casino's security office, where they
explained he was being evicted from the property and would be arrested for trespassing if he
returned. *Id.*  During this detention, one of the deputies searched the plaintiff, took his
identification, and gave it to the casino officials who copied it. *Id.*  The deputies then took the
plaintiff to the county jail. *Id.*  The charges were later dismissed. *Id.*

The district court first concluded there were numerous issues of fact, including whether
the deputies had probable cause to arrest the plaintiff for disorderly conduct where the parties
disputed why the deputies arrested the plaintiff. *Id.* at *6.  In detailing the factual issues, the
court noted that the deputy did not "have the right to give the ID card to the casino." *Id.*; *see also*
*Grosch v. Tunica Cty., Miss. (Grosch II)*, No. CIV A 2:06CV204-P-A, 2009 WL 161856, at *4
(N.D. Miss. Jan. 22, 2009) (stating the "deputy did not have the legal right to give the plaintiff's
ID to the casino").  On the issue of qualified immunity, the district court ruled that when viewing
the facts in the light most favorable to the plaintiff, the deputy's "conduct was not objectively
reasonable—e.g., requiring the plaintiff to give his ID card without reasonable, articulable

suspicion that the plaintiff was engaged in criminal activity; handcuffing, detaining, and searching the plaintiff in the casino security room; and giving the plaintiff's ID card to the casino to copy." *Grosch I*, 2008 WL 114773, at *8. Neither *Grosch I* nor *Grosch II* identifies the clearly established law that put the deputy on notice that giving the identification to the casino would violate the Fourth Amendment.

This single case does not suffice to set forth clearly established law that would put a reasonable officer on notice that if she gave McCall's identification to the casino to take down information, she would be violating McCall's Fourth Amendment rights, particularly where McCall voluntarily provided the officer with his identification and did not object when she provided it to the casino.[7] Absent controlling authority, and absent a robust consensus of persuasive on-point authority, McCall has failed to identify clearly established law that would put a reasonable officer on notice that she was breaking the law by temporarily handing an identification card to a casino official that the officer obtained through the plaintiff's voluntary consent without objection from the plaintiff. Muenzenmeyer is therefore entitled to qualified immunity (as are the other officers, to the extent McCall contends they participated in this violation). McCall has not presented any evidence, nor does he argue, that LVMPD has a custom or practice of turning over identification to casinos. Thus, to the extent he meant to assert this portion of his § 1983 claim against LVMPD, it fails. I therefore grant the defendants' motion for summary judgment on this portion of McCall's § 1983 claim.

////

////

---

[7] I do not equate McCall's failure to object with consent, but his failure to object contrasts the facts in this case to those in *Grosch*.

# IV.  STATE LAW CLAIMS

McCall asserts state law claims for false imprisonment, battery, defamation, negligence per se, intentional infliction of emotional distress, and intentional interference with contractual rights against all of the defendants.  He also asserts a claim for trespass to chattels against Muenzenmeyer, Thompson, and The D.  McCall does not move for summary judgment on these claims.

Jacobitz, Muenzenmeyer, Hafen, and Ramirez-Marillo move for summary judgment on all of McCall's state law claims, both on the merits and because they claim they are entitled to discretionary immunity.  LVMPD also moves for judgment, arguing that if the officers are not liable, then LVMPD also cannot be liable on a theory of respondeat superior.  Thompson and DROCK join the officers' motion and argue that they had no participation in the complained-of conduct.  McCall responds that there are genuine disputes on the merits and discretionary immunity does not apply to intentional torts.

## A.  False Imprisonment

The officers argue that because they had reasonable suspicion to stop McCall, they did not falsely imprison him as a matter of law.  Thompson and DROCK argue that they did not imprison McCall because he was being held by the officers, not The D.  McCall argues that a reasonable jury could find the officers did not have a reasonable suspicion, or that the officers lacked justification to continue to detain him once reasonable suspicion was dispelled.

"To establish false imprisonment . . ., it is . . . necessary to prove that the [plaintiff was] restrained of his liberty under the probable imminence of force without any legal cause or justification." *Garton v. City of Reno*, 720 P.2d 1227, 1228 (Nev. 1986) (quotation omitted).

Reasonable suspicion may provide legal justification for an arrest to defeat a claim of false

imprisonment. *See Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981).

As discussed above, a genuine dispute remains about whether the officers' detention of

McCall was unreasonable throughout the entire detention. The officers are not entitled to

discretionary immunity on this claim because false imprisonment is an intentional tort. *Franchise

Tax Bd. of State of Cal. v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017) (en banc) (holding that

discretionary immunity "does not protect a government employee for intentional  torts or bad-

faith misconduct"); *Fanders v. Riverside Resort & Casino, Inc.*, 245 P.3d 1159, 1163 (Nev.

2010) (describing false imprisonment as an intentional tort). I therefore deny summary judgment

on this claim for the police officers and LVMPD.

However, there is no evidence Thompson or DROCK falsely imprisoned McCall. The

police officers detained him, not Thompson or any other The D personnel. I therefore grant

summary judgment on this claim as to Thompson and DROCK.

**B.  Battery**

The officers argue that because they properly placed McCall in handcuffs, there can be

no battery as a matter of law. Thompson and The D argue they never touched McCall. McCall

responds that a reasonable jury could find the handcuffing was unreasonable.

"Under Nevada law, a police officer is privileged to use the amount of force reasonably

necessary." *Vasquez-Brenes v. Las Vegas Metro. Police Dep't,* 51 F. Supp. 3d 999, 1014 (D.

Nev. 2014), *rev'd on other grounds*, 670 F. App'x 617 (9th Cir. 2016). However, "[a]n officer

who uses more force than is reasonably necessary is liable for battery." *Id.*; *see also Ramirez v.

City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law).

Because genuine disputes remain about whether the police officers used reasonable force with respect to the use of handcuffs, I deny summary judgment on this claim for the police officers and LVMPD. And because battery is an intentional tort, the officers are not entitled to discretionary immunity. *Fanders*, 245 P.3d at 1163 (describing battery as an intentional tort). I therefore deny summary judgment to the police officers and LVMPD on this claim.

However, there is no evidence Thompson or any other employee of The D touched McCall. I therefore grant summary judgment in their favor on this claim.

**C. Defamation**

The officers argue they are not liable for defamation because they did not act negligently and they did not parade McCall around in handcuffs. They also argue they are entitled to discretionary immunity. Thompson and The D argue that reporting suspicious behavior to the police is privileged. McCall responds that he was held in handcuffs in a public place, thus suggesting he is a criminal, which is defamatory per se.

To establish a prima facie case of defamation, a plaintiff must prove: (1) the defendant made a false and defamatory statement about the plaintiff; (2) "an unprivileged publication to a third person;" (3) "fault, amounting to at least negligence;" and (4) "actual or presumed damages." *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 462 (Nev. 1993). "Words or conduct or the combination of words and conduct can communicate defamation." *K–Mart Corp. v. Wash.*, 866 P.2d 274, 282–83 (Nev. 1993) (store security officer walking the plaintiff through the store in handcuffs constituted slander per se because that conduct suggested that the plaintiff was a shoplifter), *overruled in part on other grounds by Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1148 (9th Cir. 2012) (applying Nevada law

and holding questions of fact remained regarding whether casino security officer defamed the plaintiff by handcuffing and removing her from the casino in view of other patrons).

A reasonable jury could find the officers published a defamatory per se statement to the patrons in The D casino that McCall was a criminal by holding him in handcuffs where other patrons observed him. The video shows numerous patrons looking at McCall and the officers while McCall is held in handcuffs. Because, as discussed above, a reasonable jury could find the officers lacked reasonable suspicion to continue his detention and lacked a reasonable basis to hold him in handcuffs, a reasonable jury could find the officers' conduct was not privileged and that the officers were at least negligent. Defamation is an intentional tort for which the officers are not entitled to discretionary immunity. *Ponder v. Wild*, No. 2:18-cv-01604-APG-BNW, 2019 WL 4781850, at *3 (D. Nev. Sept. 30, 2019) (characterizing defamation as an intentional tort). I therefore deny summary judgment to the officers and LVMPD for this claim.

Neither The D nor Thompson placed McCall in handcuffs, so they cannot be liable for defamation based on the handcuffing. To the extent McCall is contending that The D's report of suspicious activity was defamatory, it was privileged and there is no evidence it was made in bad faith. *See Pope v. Motel 6*, 114 P.3d 277, 283 (Nev. 2005). I therefore grant summary judgment to Thompson and DROCK on this claim.

**D. Negligence Per Se**

The officers argue McCall asserts a claim for negligence per se based on the violation of criminal statutes for assault, battery, and false imprisonment, but there is no negligence per se for violation of criminal statutes. Thompson and DROCK join in this argument. McCall does not respond.

McCall's negligence claim is based on the alleged violation of criminal statutes. ECF No. 25 at 15. Under Nevada law, "in the absence of evidence of legislative intent to impose civil liability, a violation of a penal statute is not negligence per se." *Hinegardner v. Marcor Resorts, L.P.V.*, 844 P.2d 800, 803 (Nev. 1992). McCall does not identify any legislative intent to impose civil liability for negligence for a violation of any of the identified criminal statutes. I therefore grant summary judgment to all defendants on this claim.

## E. Intentional Infliction of Emotional Distress

The officers argue their conduct was not extreme and outrageous. They also contend there is no evidence McCall suffered emotional distress. Thompson and DROCK argue they also did not engage in extreme and outrageous behavior and there is no evidence McCall suffered emotional distress from their actions. McCall responds that a reasonable jury could find the defendants' behavior extreme and outrageous.

Under Nevada law, an intentional infliction of emotional distress (IIED) claim requires three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (en banc). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (quotation omitted). However, "persons must necessarily be expected and required to be hardened to occasional acts that are definitely inconsiderate and unkind." *Id.* (omission and quotation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.").

The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as relevant authority for IIED claims under Nevada law. *See, e.g.*, *Olivero v. Lowe*, 995 P.2d 1023, 1027 (Nev. 2000); *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980). A police officer's conduct may rise to the level of extreme and outrageous when he engages in an "extreme abuse" of his position. Restatement (Second) of Torts § 46, cmts. The comments to the Restatement offer examples of when a police officer's conduct may be so outrageous as to support an IIED claim, such as where the officer attempts to extort money by a threat of arrest or attempts to extort a confession by falsely telling the accused her child has been injured in an accident and she cannot go to the hospital until she confesses. "The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

The defendants' conduct here was not extreme and outrageous as a matter of law. The officers' behavior does not rise to the level of an extreme abuse of power sufficient to support an IIED claim. Likewise, Thompson's reading of a trespass warning is not extreme and outrageous. Nor is The D's security personnel reporting what they viewed as suspicious activity and requesting to be notified if the police detained McCall. Moreover, McCall has not pointed to any evidence he suffered emotional distress. I therefore grant summary judgment for all defendants on this claim.

**F. Intentional Interference with Contractual Rights**

The officers argue there is no evidence they knew McCall had a contractual relationship with the person at the kiosk on Fremont Street, that they intended to disrupt any such

relationship, or that McCall's contractual relationship was disrupted. Thompson and DROCK argue that McCall does not allege, and there is no evidence, that they participated in the officers following McCall to the kiosk on Fremont Street. McCall responds that the officers followed him into his place of employment and diminished his employer's view of him by letting it be known he was the target of police scrutiny.

To establish a claim for intentional interference with contractual relations, McCall must show: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (quotation omitted). I grant summary judgment on this claim to all defendants because McCall does not point to any evidence that his contract with his employer was disrupted by the officers' conduct and neither Thompson nor any other The D personnel went to the kiosk.

### G. Trespass to Chattels

Muenzenmeyer argues there is no evidence McCall was damaged by her handing his identification to Thompson. Thompson and DROCK do not specifically address this claim in their joinder. McCall responds that because this is an intentional tort, he is entitled to at least nominal damages.

A trespass to a chattel may be committed by intentionally . . . dispossessing another of the chattel." Restatement (Second) of Torts § 217(a) (1965). "A dispossession may be committed by intentionally . . . taking a chattel from the possession of another without the other's consent." Restatement (Second) of Torts § 221(a) (1965). Trespass to chattels requires showing that:

(a) the chattel is impaired as to its condition, quality, or value, or

(b) the person entitled to immediate possession is deprived of the use of the chattel for a substantial time, or
(c) bodily harm is thereby caused to the person entitled to immediate possession, or harm is caused to some person or thing in which he has a legally protected interest.

Restatement (Second) of Torts § 219 (1965). However, a "dispossession is always a trespass to the chattel, and subjects the actor to liability for at least nominal damages for the interference with the possession." Restatement (Second) of Torts § 222 cmt. a. (1965); *Cf. Parkinson v. Winniman*, 344 P.2d 677, 678 (Nev. 1959) (allowing an award of nominal damages for trespass to real property that causes no damages).

A reasonable jury could find Muenzenmeyer dispossessed McCall of his identification by giving it to Thompson without McCall's consent and that Thompson dispossessed McCall of his identification by taking it from Muenzenmeyer without McCall's consent. Even though McCall has not produced any evidence of damages, he may be able to recover nominal damages. Finally, Muenzenmeyer is not entitled to discretionary immunity because trespass to chattels is an intentional tort. *Mathis v. Cty. of Lyon*, No. 2:07-CV-00628-APG-GWF, 2014 WL 1413608, at *13 (D. Nev. Apr. 11, 2014). I therefore deny summary judgment to Muenzenmeyer, LVMPD, Thompson, and DROCK for this claim.

## V. CONCLUSION

I THEREFORE ORDER that plaintiff Darius McCall's motion for summary judgment **(ECF No. 48) is GRANTED in part and DENIED in part**.

I FURTHER ORDER that defendants DROCK Gaming LLC and Raymond Thompson's motion for summary judgment **(ECF No. 56) is GRANTED in part and DENIED in part**.

I FURTHER ORDER that defendants Colton Hafen, Jeremy Jacobitz, Brianna Muenzenmeyer, and George Ramirez-Marillo's motion for summary judgment **(ECF No. 62) is GRANTED in part and DENIED in part**.

I FURTHER ORDER that defendant Las Vegas Metropolitan Police Department's motion for summary judgment **(ECF No. 63) is GRANTED in part and DENIED in part**.

I FURTHER ORDER that the clerk of court shall seal Jacobitz's and Muenzenmeyer's bodycam videos and ECF No. 52-6.

DATED this 23rd day of March, 2020.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE